UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) ) | |
| v. | ) ) | Criminal Action No. 14-cr-0069 (RMC) |
| PHEERAYUTH BURDEN, | ) ) ) | |
| WING-ON LLC, | ) ) | |
| Defendants. | ) ) | |

**OPINION ON JOINT MOTION FOR A JUDGMENT OF ACQUITTAL**

Defendants Pheerayuth Burden and Wing-On LLC moved at the close of the government's case in their criminal trial and at the close of all evidence for judgment of acquittal. The Court heard arguments and denied both motions in open court. This Opinion explains those rulings.

**I.  BACKGROUND**

By Superseding Indictment filed on July 16, 2015, Pheerayuth Burden and Wing-On LLC were charged with conspiracy to violate the Arms Export Control Act by exporting and attempting to export defense articles on the United States Munitions List without a license. The same count also charged both Defendants with conspiracy to defraud the United States by impeding its lawful function in administering its export laws by attempting to export defense articles on the Munitions List from the United States by deceit, craft, trickery, and dishonest means. *See* Superseding Indictment (Indictment) [Dkt. 48] ¶ 10 (Count 1). Further, both Defendants were charged in Count Two with knowingly and willfully exporting, attempting to export and causing to be exported on July 31, 2011, five (5) AR Style, NATO 5.56, 30-round

1

magazines and one KAC-Knight Armament M203 Qd Mount, by which one could mount a grenade launcher onto an AR-15 rifle. *See id*. ¶ 16. Count Three charged both Defendants with conspiracy to commit money laundering. *See id*. ¶ 18. The Indictment also contained a forfeiture allegation demanding that Defendants forfeit to the United States any property, real or personal, which constitutes, or is derived from, proceeds traceable to a violation of the AECA. *See id*. at 10-11.

Mr. Burden is a native of Thailand lawfully in the United States and conducting an export business specializing in the transportation of U.S. goods to Thailand from California. He was originally charged with co-Defendant Kitibordee Yindeear-Rom, a Thai native living in Thailand with whom Mr. Burden allegedly conspired to export gun parts on the Munitions List without a license from the U.S. Department of State (USDS). Mr. Yindeear-Rom entered a guilty plea in November 2014, served close to three years in prison in the United States, and was subsequently deported to Thailand. Defendant Wing-On LLC was incorporated in California and operates from that State. It is wholly-owned by Mr. Burden.

This matter was tried between September 12 and September 29, 2016. Each Defendant was represented by counsel. On September 26, 2016, at the close of the government's case-in-chief, Defendants presented a brief and exhibits in support of their Joint Motion for a Judgment of Acquittal. *See* Jt. Mot. [Dkt. 120]. Oral motions for acquittal were argued in court and denied. At the close of the evidence (including Defendants' witnesses and rebuttal by the government), Defendants moved again for a judgment of acquittal. After argument, the motion was again denied and the Court indicated a written opinion would follow.

This is that written opinion.[1]

## II. APPLICABLE LAW

"After the government closes its evidence," and upon a defendant's motion, Rule 29 of the Federal Rules of Criminal Procedure provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *United States v. Naegele*, 537 F. Supp. 2d 36, 37-38 (D.D.C. 2008) (quoting Fed. R. Crim. P. 29(a)). In ruling on such a motion the court "consider[s] the evidence in the light most favorable to the government and determin[es] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001). "The question is whether the evidence is sufficient for a rational juror to [find] the defendant guilty." *Naegele*, 537 F. Supp. 2d at 38 (citing *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995).

The Arms Export Control Act (AECA), 22 U.S.C. § 2778, authorizes the President "to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). In order to control the import and export of defense articles and services, the President "is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List." *Id*. In order to import or export an

---

[1] Jury deliberations began on September 29 and continued on September 30, 2016. On the latter date, the Jury returned verdicts of guilty on all Counts against both Defendants. Sentencing has not occurred.

item designated on the United States Munitions List, an individual or corporation must obtain a license. *See* 22 U.S.C. § 2778(b)(2).

The United States Munitions List is codified in the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120-130. "The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services. The items designated by the Secretary of State for purposes of export and temporary import control constitute the U.S. Munitions List specified in part 121 of this subchapter." 22 C.F.R. § 120.2.

Defendants argued that they should have been acquitted on Counts I and II of the Indictment because the government failed to prove beyond a reasonable doubt that the products at issue were defense articles. Specifically, both Counts I (conspiracy) and II (willful violation of the AECA) required proof beyond a reasonable doubt that either the five AR Style, NATO 5.56, 30-round magazines, or the KAC-Knight Armament M203 Qd Mount is a defense article. Defendants also argued for acquittal on Count II because (1) there was insufficient proof that Mr. Burden or Wing-On knowingly exported the magazines or mount to Thailand and (2) the Government did not prove that the magazines or mount were "components" as defined in the ITAR. With those two Counts dismissed, Defendants argued that the money laundering charge in Count Three must also be dismissed.

### III. ANALYSIS

**A. Did the Government Prove that the Gun Parts Are Defense Articles?**

Defendants challenge the testimony, or lack thereof, by the government's expert witness from the USDS Directorate of Defense Trade Controls, Robert Warren. According to Defendants, the Government failed to present sufficient evidence to establish that the gun parts at issue were defense articles because its witness, Mr. Warren, failed to testify that the gun parts in

question were "specifically designed, modified, or adapted for military application," or to seek a commodity jurisdiction determination as to whether either the magazines, designed to hold 30 rounds, or the KAC-Knight Armament M203 Qd Mount, designed to attach a grenade launcher to a rifle, were defense articles.

Defendants note that prior to October 14, 2013 (the time relevant herein), an article or service was a defense article if it:

> (a) [Was] specifically designed, developed, configured, adapted, or modified for a military application, and
> i. [Did] not have predominant civil applications, and
> ii [Did] not have performance equivalent (defined by form, fit and function) to those of an article or service used for civil applications; or
>
> (b) [Was] specifically designed, developed, configured, adapted, or modified for a military application, and [had] significant military or intelligence applicability such that control under this subchapter [was] necessary.

22 C.F.R. § 120.4 (2010) (tense altered); *see also United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012) (finding that "the determination or designation of articles or services turns on whether an item is 'specifically designed, developed, configured, adapted, or modified for military application, and has significant military or intelligence applicability such that control under this subchapter is necessary'"). Defendants point out that, on cross examination, Mr. Warren testified that only those gun parts, components, accessories, and attachments that were specifically designed, modified, or adapted for military application can be designated as defense articles.

Defendants compared this testimony on cross-examination to the testimony on direct exam, when Mr. Warren testified that a variety of items constituted defense articles, explaining that each was a "critical" part or component of a firearm regulated under ITAR or that the type of item (*e.g.*, a receiver) was specifically "called out" in the ITAR. Ex. F, Trial Tr.

5

9/23/16 PM [Dkt. 120-6] at 21:6-22, 25:3-16.  Defendants surmise that "Mr. Warren used the word 'critical,' because that word is used in the version of 22 C.F.R. § 120.3 that came *into effect* on October 14, 2013," after the charged events.  Jt. Mot. at 6 (emphasis added).  As amended, the regulation now provides that an article may be designated as a defense article if it "[m]eets the criteria of a defense article . . . on the U.S. Munitions List" or "[p]rovides the equivalent performance capabilities of a defense article on the U.S. Munitions List."  22 C.F.R. § 120.3(a)(1), (2) (2013).  Defendants also cite subsection (b) of the revised regulation which states that "a specific article or service shall be determined in the future as a defense article or defense service it if provides a *critical* military or intelligence advantage such that it warrants control under this subchapter."  22 C.F.R. § 120.3(b) (emphasis added).

Defendants assail Mr. Warren's testimony that a "flash hider" was a controlled item on the Munitions List when he testified that it was "specifically called out in the United States Munitions List under category e," to which he added that category e included "[s]uppressors, flash suppressors or silence suppressors."  Jt. Mot. at 8 (quoting Ex. F, Trial Tr. 9/23/16 PM at 25:9-16).  While Defendants acknowledge that "Category I of the munitions list 'specifically calls out' flash suppressors," they argue that it was insufficient for Mr. Warren to testify to that effect without further explanation.  *Id.* at 8.  Their contention is that proving an item is on the Munitions List requires it to be "'specifically designed, modified or adapted for military application'" and that Mr. Warren provided no such testimony.  *Id.* at 9.

Defendants' challenge to Mr. Warren's testimony is based on *United States v. Pulungan*, 569 F.3d 326 (7th Cir. 2009).  In that case, Mr. Pulungan was convicted of exporting 100 riflescopes.  At trial, the government's witness testified that the Directorate of Defense Trade Controls had found the scopes in question to be "'manufactured to military

6

specifications'—but he would not say what those specifications are or why the Directorate" had concluded that the scopes in question were manufactured to them; nor was the Directorate's decision produced. *Pulungan*, 569 F.3d at 327-28. Nonetheless, at the government's request, the *Pulungan* judge instructed the jury that, as a matter of law, the scopes were manufactured to military specifications and thus took the issue away from the jury's determination. The Seventh Circuit was mightily offended:

> The Directorate's claim of authority to classify any item as a "defense article," without revealing the basis of the decision and without allowing any inquiry by the jury, would create serious constitutional problems. It would allow the sort of secret law that *Panama Refining Co. v. Ryan*, 293 U.S. 388 . . . (1935), condemned. (That case dealt with an unpublished regulation that remained "in the hip pocket of the administrator," as a serious problem apart from the nondelegation holding usually associated with *Panama Refining*.) A regulation is published for all to see. People can adjust their conduct to avoid liability. A designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes. Government must operate through public laws and regulations. *See United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009). Thus the United States must prove, and not just assert, that the . . . riflescope is "manufactured to military specifications."

*Pulungan*, 569 F.3d at 328.

Defendants' argument misses the mark. Mr. Warren was accepted as an expert witness "in the application of the Arms Export Control Act [and] its related regulations, the International Traffic and Arms Regulations and in particular determination of whether firearms, parts and accessories are controlled under those regulatory provisions." Ex. F, Trial Tr. 9/23/16 PM at 9:13-17. Defendants offered "[n]o objection." *Id.* at 9:18-19. The Court then instructed the jury that "because of his experience and training[,] this gentleman can tell you not only facts, but can also give you his opinions. You should evaluate his testimony just like anybody else's

and you can accept it or accept part of it, whatever you decide as to its credibility and support, but he unlike most witnesses is allowed to offer his opinions to you." *Id.* at 9:23-10:3.

Most critically, Defendants' argument fails because, as the government reminded the Court and Defendants in oral argument on the motion for judgment of acquittal:

> In fact, what Mr. Warren testified on direct when talking about what exactly a defense article is[,] on page 12, line 21 [Ex. F, Trial Tr. 9/23/16 PM] he was asked . . . . What exactly is a defense article? And then he explained, well a defense article as we termed it is anything that has a military significance or military application.
>
> So what he testified to was defense articles have military significance or application. They're placed on the United States Munitions List. He then determined whether the particular items we have here are defense articles as enumerated in the ITAR itself. And that's exactly what he did, then he conducted the comparison.

Trial Tr. 9/27/16 PM at 81:8-19.

Additionally, Mr. Warren testified to the history and development of the ACEA and the ITAR, commenting in part, "the law is somewhat hard to read okay, so the regulations simply simplify [it] and tell[] U.S. industry and the State Department quite frankly what they have to do to implement the law." Ex. F, Trial Tr. 9/23/16 PM at 10:21-25. He testified that the ITAR "generally describes the articles that are controlled," specifically, as relevant to this case, "automatic firearms, close assault weapons which we would consider carbine, scopes, barrels are called out specifically, receivers are called out specifically, breach mechanisms are called out specifically, suppressors are called out specifically. . . . And this final category is all parts, components and accessories of a firearm are called out in Category (h)." *Id.* at 11:1-18.

Clearly, Mr. Warren's testimony was presented under materially different circumstances than those attending the government's witness in *Pulungan*. First, as an unchallenged expert, he could testify to facts and opinions. Second, the jury was specifically instructed that it should treat his testimony as any other witness's testimony, deciding for itself

whether to credit it and, if so, how much to credit it. Third, Defendants had full opportunity to cross examine Mr. Warren and identify any weaknesses in his testimony to the jury in separate closing arguments on behalf of Mr. Burden and Wing-On. Fourth, the jury alone decided what weight, if any, to give Mr. Warren's testimony. To be precise, the circumstances of these Defendants' trial were exactly the opposite of Mr. Pulungan's.

Defendants also argue that it was necessary for the government to submit formal commodity determinations as to the mount and magazine. Defendants read this requirement from the language of the regulation, which states: "[t]he commodity jurisdiction procedure is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Defendants equate the "doubt" referenced in the regulation with the doubt that exists in a criminal trial before a jury verdict of proof beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970) ("Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged."). Because Mr. Burden and Wing-On were presumed innocent until the Government proved each necessary fact beyond a reasonable doubt, Defendants argued that there was "doubt" and "doubt" required the Government to employ the commodity jurisdiction process.

The Court does not interpret the word "doubt" to have such a specific meaning as it is used in the ITAR. Defendants offer no case or background to support their interpretation of the word "doubt" in the ITAR, and the Court refuses to interpret the use of "doubt" in all statutes to constitute a direct connection to the standard for conviction in a criminal case. Without evidence of the specific intent of the drafters, "doubt" can just as easily be read to allow for

commodity jurisdiction when an exporter or importer doubts whether an item is on the Munitions List and asks if it is subject to ITAR's jurisdiction.  The Government's expert, Mr. Warren, testified that he had no "doubt" as to the designation of the magazine or the mount and, therefore, he did not institute the commodity jurisdiction procedure.  The Court will not read a greater regulatory requirement into the ITAR.

Defendants also imply that it is possible that if the commodity jurisdiction procedure had been completed the magazine and mount would have been determined not to be included on the Munitions List.  If Defendants believed a commodity jurisdiction determination could have contradicted Mr. Warren's testimony that the items were defense articles and were included on the Munitions List, they too could have requested a commodity jurisdiction determination.

At the close of the evidence, there was clearly sufficient evidence from which a jury could convict.  The jury credited Mr. Warren, whose testimony was fairly straight forward.  That was clearly its role and the Court had no basis to take the question from the jury.  The Court finds the Government provided sufficient evidence to allow a reasonable juror to conclude that the magazine and mount at issue here are defense articles under AECA and ITAR.

**B. Was There Sufficient Evidence of Exportation by Defendants?**

Before the verdict, Defendants argued that the Government failed to provide sufficient evidence to support a finding that Mr. Burden and Wing-On knowingly exported the magazine and mount and, therefore, they should be acquitted on Count II.  Defendants focus on the inconsistency between Agent Stein's initial conversation with Mr. Burden about shipping gun parts to Thailand after Mr. Burden personally removed them from a warehouse shelf labeled, "Gun Parts No Go," and the fact that Wing-On was not located in the warehouse with the "Gun Parts No Go" shelf when the magazine and mount were allegedly shipped.  Because it would

have been impossible for Mr. Burden (and Wing-On) to remove these gun parts from a shelf that did not yet exist, Defendants argue the Government has failed to provide sufficient evidence for a reasonable juror to conclude Defendants knowingly exported the magazine and mount.

Mr. Burden's work history in the United States was established by both parties during the trial, although Mr. Burden (as was his absolute right) did not testify.  He started Wing-On after working for another U.S. exporter to Thailand, learning the ropes, and then losing that job.  Mr. Burden's wife, Amornrat Burden, worked with him.  At its inception, Wing-On was a small operation based in Mr. Burden's home in Torrance, California.  By July 27, 2011, it had grown enough to require a warehouse to receive U.S. goods intended for Thai purchasers that Wing-On would gather and crate for shipment via ocean or air.  Mr. Burden and Wing-On also sent some amount of U.S. product to Thai purchasers by mail.

Defendants argue that Mr. Yindeear-Rom (using a U.S.-based credit card obtained for him by Mr. Burden and in Mr. Burden's name and address) purchased the five (5) AR Style, NATO 5.56, 30-round magazines and one KAC-Knight Armament M203 Qd Mount, which were delivered to Mr. Burden's home address.  Defendants acknowledge that Mr. Yindeear-Rom's records show that these items were delivered to him in Thailand.  They challenge the "lack" of evidence that either Mr. Burden or Wing-On handled, exported, or had anything to do with shipping the five (5) AR Style, NATO 5.56, 30-round magazines and one KAC-Knight Armament M203 Qd Mount.

Defendants correctly point out that no "smoking gun" email or direct witness testimony ties Mr. Yindeear-Rom's purchase of the mount and magazines to knowing exportation by Mr. Burden and Wing-On.  However, the Government did present circumstantial evidence, including Mr. Yindeear-Rom's use of Mr. Burden's credit card to purchase the items,

11

Mr. Burden's home address as the point of domestic delivery—from which Wing-On was operating at the time—, and Mr. Yindeear-Rom's testimony and records that he received exactly these items—which he had ordered—in Thailand.  The jury was instructed that direct and circumstantial evidence could be considered and that, contrary to Defendants' argument, one is not better than the other.  *See* Jury Instructions [Dkt. 121] at 16 ("[E]vidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence. . . . The law says that both direct and circumstantial evidence are acceptable as a means of proving a fact.  The law does not favor one form of evidence over another.  It is for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial.  You are permitted to give equal weight to both.").  Further, the jury was allowed to draw reasonable inferences from the evidence presented and it cannot be said that such an inference on these facts was unreasonable.  *Id*. at 11 ("When you consider the evidence, you are permitted to draw, from the facts that you find have been proven, such reasonable inferences as you feel are justified in the light of your experience.  You should give any evidence such weight as in your judgment it is fairly entitled to receive.").  The Court finds the Government presented sufficient evidence to allow a reasonable juror to find that Defendants knowingly exported five (5) AR Style, NATO 5.56, 30-round magazines and one KAC-Knight Armament M203 Qd Mount.

### C. Was There Sufficient Evidence that the Magazines or Qd Mount were "Components" as Required by ITAR?

Defendants also argue for acquittal on Count II because the Government failed to establish that the magazine or mount at issue were "components" as defined in the ITAR.  Defendants explain that components must be "useful only when used in conjunction with an end-item" and without which the end-item is inoperable. 22 C.F.R. § 120.45(b).  "An end-item is a system, equipment, or an assembled article ready for its intended use.  Only ammunition or fuel

or other energy source is required to place it in an operating state." 22 C.F.R. § 120.45(a). The AECA prohibits the import and export of more than just end-items and components, however, as defense articles may include parts, accessories, and attachments. 22 C.F.R. § 121.1, Category I(h) (including "[c]omponents, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category" in the Munitions List). "Accessories and attachments are associated articles for any component, equipment, system, or end-item, and which are not necessary for its operation, but which enhance its usefulness or effectiveness." 22 C.F.R. § 120.45(c). "A part is any single unassembled element of a major or a minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of designed use." 22 C.F.R. § 120.45(d). Due to the nature of the magazine and mount, Defendants argue that the Government needed to establish that both were components and not mere parts or accessories. This argument was followed by noting the evidence that both items have dual uses, with real guns and airsoft guns. Defendants conclude that the magazines for bullets and the mount for a grenade launcher are "useful *only* when used in conjunction with an end-item," as required to be a component. 22 C.F.R. § 120.45(b).

First of all, Defendants offer no testimonial or other support for their argument. Second, even assuming the magazine and mount could be categorized as components, rather than parts, accessories, or attachments, Defendants' argument ignores the most reasonable interpretation of the ITAR. An item may be a component if, standing alone, it is not useful, but becomes "useful only when used in conjunction with an end-item." 22 C.F.R. § 120.45(b). A magazine, for example, sitting on a table or in the hands of an assailant is not useful on its own. Once the magazine is used in conjunction with a firearm, it becomes useful and deadly for

automatic fire. Therefore, the magazine is useful only in connection with an end-item, in this case a firearm.

As explained in the jury instructions for Count II—Willful Violation of Arms Export Control Act—the Government was required to establish the following:

1. That the defendant knowingly exported the five AR Style, NATO 5.56, 30 round magazines, or the KAC-Knight Armament M203 Qd Mount;

2. That the item exported was a defense article on the Munitions List that required a license from the U.S. Department of State for its export;

3. That the defendant failed to obtain a license from the U.S. Department of State; and

4. That the defendant acted willfully.

Jury Instructions at 40. As discussed above, the Court finds the evidence was sufficient to allow a reasonable juror to conclude (1) "[t]hat the defendant knowingly exported the five AR Style, NATO 5.56, 30 round magazines, or the KAC-Knight Armament M203 Qd Mount" and (2) "[t]hat the item exported was a defense article on the Munitions List that required a license from the U.S. Department of State for its export." *Id*. Defendants do not dispute here the evidence applicable to the third and fourth prongs of Count II. Accordingly, the Court did not grant judgment of acquittal on Count II.[2]

### IV.  CONCLUSION

Having studied the brief submitted by Defendants before the argument on the motion for judgment of acquittal, having heard the parties' arguments at the close of the government's evidence and—more expansively—at the close of all evidentiary presentations,

---

[2] Because the Court rejected Defendants' arguments on Counts I and II, their argument on Count III also failed.

and having reviewed the briefs and transcripts again in the preparation of this Opinion, the Court is of the same opinion as it stated on September 27, 2016. "[T]here's sufficient evidence from which a jury could reach [the] conclusion that at its crux Mr. Burden [and Wing-On] willfully violated the Arms Export Control Act." Trial Tr. 9/27/16 PM at 83:11-13. The motion for judgment of acquittal was denied. A memorializing order accompanies this memorandum opinion.


Date: November 8, 2016                                   /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge